*PRELIMINARY PRINT*

VOLUME 605 U. S. PART 2
PAGES 665–713

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 18, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published.   Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

Syllabus

## NUCLEAR REGULATORY COMMISSION ET AL. *v.* TEXAS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 23–1300.   Argued March 5, 2025—Decided June 18, 2025*

The Atomic Energy Act of 1954 generally prohibits the private possession of nuclear materials, including spent nuclear fuel, without a license. The Nuclear Regulatory Commission may license the possession of nuclear materials, subject to statutory and procedural requirements.   42 U. S. C. §§ 2073(a), 2092–2093(a), 2111(a), 2231, 2239.   Here, Interim Storage Partners (ISP) applied for a license to build a facility in West Texas to store spent nuclear fuel.   During ISP's licensing proceeding, a Texas government agency submitted comments, including comments on a draft environmental impact statement (EIS) prepared by the Commission for the proposed facility.   Fasken Land and Minerals, a private West Texas business, similarly submitted comments, and it also sought to intervene in the licensing proceeding.   The Commission denied Fasken's petition to intervene.   Fasken then unsuccessfully challenged that denial of intervention before the full Commission and the D. C. Circuit.

In September 2021, the Commission granted ISP a license to build and operate its proposed storage facility.   Texas and Fasken sought review of the Commission's licensing decision in the Fifth Circuit.   The Fifth Circuit vacated ISP's license.

*Held*: Because Texas and Fasken were not parties to the Commission's licensing proceeding, they are not entitled to obtain judicial review of the Commission's licensing decision.   Pp. 674–690.

(a) In the Hobbs Act, Congress specified that only a "party aggrieved" by a licensing order of the Commission may seek judicial review.   Texas and Fasken argue they qualify as parties because they participated in the licensing proceeding by submitting comments on the draft EIS and, in Fasken's case, by attempting to intervene.   But the text of the Atomic Energy Act indicates that one must be the license applicant or successfully intervene in order to obtain party status in a Commission licensing proceeding.   The Act provides: "[T]he Commission shall grant a hearing upon the request of any person whose interest may be affected

———————
*Together with No. 23–1312, *Interim Storage Partners, LLC* v. *Texas et al.*, also on certiorari to the same court.

by the proceeding, and shall admit any such person as a party to such proceeding." 42 U. S. C. § 2239(a)(1)(A). That text means that a "person" becomes a "party" only after that person requests to participate in a hearing before the Commission—that is, requests to intervene—and is actually "admit[ted] . . . to such proceeding" by the Commission. *Ibid.* And if the Commission fails to "admit" someone "as a party," that person is not a party. Pp. 674–678.

(b) Fasken contends that it can maintain this suit because it satisfied the statutory criteria for intervention under the Atomic Energy Act and the Commission erroneously denied its intervention petition. Fasken also argues that the Commission's intervention regulations set a higher bar for intervention than the Atomic Energy Act contemplates. But Fasken could (and already did) obtain judicial review in the D. C. Circuit of the denial of its petition to intervene. See § 2239(b)(1). In the D. C. Circuit, Fasken did not question the legality of the Commission's intervention regulations. Fasken simply challenged how the Commission applied its regulations in this case. But the D. C. Circuit rejected Fasken's arguments and upheld the Commission's denial of Fasken's petition to intervene. And Fasken did not seek en banc review in the D. C. Circuit or certiorari in this Court. The decision on intervention is final. Fasken cannot now use a new Hobbs Act suit to collaterally attack the D. C. Circuit's prior ruling on intervention. Pp. 678–680.

(c) Texas and Fasken alternatively argue that they need not be parties to challenge ultra vires agency action. Because ultra vires review could easily circumvent judicial-review statutes, this Court's cases have strictly limited nonstatutory ultra vires review. *Boire* v. *Greyhound Corp.*, 376 U. S. 473, 481. The Court's leading case on ultra vires review is *Leedom* v. *Kyne*, 358 U. S. 184, holding that nonstatutory review was available because the agency order "was an attempted exercise of power that had been specifically withheld" and violated a "specific prohibition" in the National Labor Relations Act. *Id.*, at 188–189. "The *Kyne* exception is a narrow one" that does not apply simply because an agency arguably reached "a conclusion which does not comport with the law." *Boire*, 376 U. S., at 481. Rather, it applies only when an agency acts entirely "in excess of its delegated powers and contrary to a *specific prohibition*" in a statute. *Railway Clerks* v. *Association for Benefit of Noncontract Employees*, 380 U. S. 650, 660.

For at least two reasons, Texas's and Fasken's ultra vires claims fall short. First, Texas and Fasken basically dress up a typical statutory-authority argument as an ultra vires claim. Second, ultra vires review is unavailable where a statutory review scheme provides aggrieved persons with an adequate opportunity for judicial review. See *Board of Governors, FRS* v. *MCorp Financial, Inc.*, 502 U. S. 32, 43–44. Here, entities like Texas and Fasken seeking intervention are guaranteed judi-

cial review of either the Commission's intervention denial or, if intervention is granted, the Commission's final licensing order.   Additionally, no precedent supports bringing an ultra vires claim in a court of appeals rather than first in a district court.   Pp. 680–683.

  (d) Because Texas and Fasken have no right to judicial review of the licensing proceeding, the Court today does not decide whether the Commission possessed statutory authority to issue a license to ISP. Pp. 683–687.

78 F. 4th 827, reversed and remanded.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, BARRETT, and JACKSON, JJ., joined.   GORSUCH, J., filed a dissenting opinion, in which THOMAS and ALITO, JJ., joined, *post*, p. 690.

  *Deputy Solicitor General Stewart* argued the cause for petitioners in No. 23–1300.   With him on the briefs in both cases were *Acting Solicitor General Harris*, former *Solicitor General Prelogar, Assistant Attorney General Kim, Nicole Frazer Reaves, Jennifer S. Neumann, Michael T. Gray, Justin D. Heminger,* and *Andrew P. Averbach.*
  *Brad Fagg* argued the cause for petitioner in No. 23–1312. With him on the briefs in both cases were *Timothy P. Matthews, Michael E. Kenneally,* and *Ryan K. Lighty.*

  *David C. Frederick* argued the cause for respondent Fasken Land and Minerals, Ltd.   With him on the brief in both cases were *Scott H. Angstreich, Christopher C. Goodnow, Matthew J. Wilkins, Ryan M. Folio, Allan Kanner, Annemieke M. Tennis,* and *Monica Renee Perales.   Aaron L. Nielson,* Solicitor General of Texas, argued the cause for respondent Texas et al.   With him on the brief in both cases were *Ken Paxton,* Attorney General, *Brent Webster,* First Assistant Attorney General, *Lanora C. Pettit,* Principal Deputy Solicitor General, and *Benjamin W. Mendelson* and *Sara B. Baumgardner,* Assistant Solicitors General.†

———————
  †*Anne R. Leidich* and *Jay E. Silberg* filed a brief in both cases for Holtec International as *amicus curiae* urging reversal.
  Briefs of *amici curiae* urging affirmance in both cases were filed for the State of Idaho by *Raúl R. Labrador,* Attorney General of Idaho, *Alan*

JUSTICE KAVANAUGH delivered the opinion of the Court.

More than 50 nuclear power plants in the United States produce electricity for American homes and businesses. But those plants also generate dangerous spent nuclear fuel, which is usually stored on site. Because some plants are shutting down or no longer operating, on-site storage is not a viable long-term solution. To address the storage problem, federal law has long designated the Yucca Mountain Nuclear Waste Repository in Nevada as the future permanent site for disposal of spent nuclear fuel. But the Nevada project has caused significant political controversy and has stalled.

To fill the void, some private businesses have sought to build and operate facilities to store spent nuclear fuel "off site"—that is, off the site of a nuclear power plant. To do so, however, they need to obtain licenses from the Nuclear Regulatory Commission.

*Hurst,* Solicitor General, *Michael A. Zarian,* Deputy Solicitor General, and *Robert M. Follett* and *Ann N. Yribar,* Deputy Attorneys General; for the State of New Mexico et al. by *Raúl Torrez,* Attorney General of New Mexico, and by *Dana Nessel,* Attorney General of Michigan, *Aletheia V. P. Allen,* Solicitor General, *William Grantham,* Assistant Attorney General, *Lawrence Marcus,* Assistant Solicitor General, and *Esther Jamison,* Assistant Attorney General; for the State of Utah et al. by *Derek E. Brown,* Attorney General of Utah, *Stanford E. Purser,* Solicitor General, and *Haley Sousa,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Tim Griffin* of Arkansas, *Brenna Bird* of Iowa, *Gentner F. Drummond* of Oklahoma, *Alan Wilson* of South Carolina, *Marty J. Jackley* of South Dakota, and *John B. McCuskey* of West Virginia; for Beyond Nuclear, Inc., by *Diane Curran* and *Mindy Goldstein*; for Don't Waste Michigan et al. by *Wallace L. Taylor* and *Terry J. Lodge*; for the Pacific Legal Foundation by *Oliver J. Dunford*; for the Permian Basin Petroleum Association et al. by *James R. Conde*; and for Sen. Ted Cruz et al. by *Jason R. LaFond.*

Briefs of *amici curiae* were filed in both cases for the City of Fort Worth by *Laetitia Coleman Brown*; and for the Nuclear Energy Institute, Inc., by *Paul D. Clement, Andrew C. Lawrence, Ellen C. Ginsberg,* and *Jonathan M. Rund.*

Here, the Commission granted a renewable 40-year license to a private entity seeking to store spent nuclear fuel at an off-site facility in West Texas. The State of Texas and a private West Texas business known as Fasken Land and Minerals objected to the project and sued in the U. S. Court of Appeals for the Fifth Circuit. They argued that federal law does not authorize storage of spent nuclear fuel at private *off-site* facilities.

The threshold question here is whether Texas and Fasken may maintain this suit. The Court of Appeals said yes. We disagree. Under the Hobbs Act, only an aggrieved "party" may obtain judicial review of a Commission licensing decision. To qualify as a party to a licensing proceeding, the Atomic Energy Act requires that one either be a license applicant or have successfully intervened in the licensing proceeding. In this case, however, Texas and Fasken are not license applicants, and they did not successfully intervene in the licensing proceeding. So neither was a party eligible to obtain judicial review in the Fifth Circuit. For that reason, we reverse the judgment of the Court of Appeals and do not decide the underlying statutory dispute over whether the Nuclear Regulatory Commission possesses authority to license private off-site storage facilities.

I

A

In 1954, Congress passed and President Eisenhower signed the Atomic Energy Act. 68 Stat. 919, 42 U. S. C. § 2011 *et seq.* The Act allowed for private commercial nuclear power plants. Today, more than 50 nuclear power plants—along with coal, natural gas, and renewable energy sources—produce electricity for American homes and businesses. In all, nuclear power plants generate almost 20 percent of the electricity in America.

Nuclear power plants also create radioactive waste—as relevant here, spent nuclear fuel. To lawfully store that

waste, nuclear power plants and storage facilities must obtain a license from the Nuclear Regulatory Commission. §§ 2073(a), 2092–2093(a), 2111(a).

A license application initiates an adjudicatory proceeding where the Commission determines whether the applicant has met the statutory and regulatory criteria. §§ 2231, 2239. Section 2239 governs intervention in those proceedings. It states: "In any proceeding" for "the granting, suspending, revoking, or amending of any license . . . any person whose interest may be affected by the proceeding" may request to intervene and participate in a hearing, and the Commission "shall admit any such person as a party to such proceeding." § 2239(a)(1)(A). The Commission in turn has promulgated regulations specifying when a person may intervene under § 2239. Among other things, the Commission directs intervenors to proffer a "contention" that shows a "genuine dispute . . . on a material issue of law or fact." 10 CFR § 2.309(f) (2024). In 1990, the D. C. Circuit upheld the Commission's intervention regulations as consistent with the Atomic Energy Act. See *Union of Concerned Scientists* v. *NRC*, 920 F. 2d 50, 51–56.

The licensing proceeding culminates with a final order by the Commission that either grants or denies the license. The final orders of the Commission are subject to judicial review under the Administrative Orders Review Act of 1950, commonly known as the Hobbs Act. Ch. 1189, 64 Stat. 1129, as amended; see § 2239(b). The Hobbs Act provides that any "*party* aggrieved by the final order may, within 60 days after its entry, file a petition to review the order" in a court of appeals. 28 U. S. C. § 2344 (emphasis added).

B

For decades, the question of how best to store and dispose of spent nuclear fuel has sparked contentious American policy and political debates, and intermittent legislative and regulatory efforts. More than 50 commercial nuclear power

plants in the United States now store spent nuclear fuel on site at the plants themselves. That waste must be carefully stored in pools or casks. Safe storage requires substantial space and resources.

In 1980, acting pursuant to the 1954 Atomic Energy Act, the Nuclear Regulatory Commission promulgated regulations governing the licensing of private spent fuel storage facilities. 45 Fed. Reg. 74693 (1980); see 10 CFR pt. 72. In adopting those regulations, the Commission emphasized that it was not claiming new authority, but instead was codifying "certain existing regulatory practices and better defin[ing] licensing requirements covering" off-site storage under the Atomic Energy Act. 45 Fed. Reg. 74693. Under the Commission's regulations, private storage facilities for spent nuclear fuel may be located *either on site* or *off the site* of a commercial nuclear power plant. *Id.*, at 74696. Eligible storage facilities can obtain renewable 40-year licenses for interim storage of spent nuclear fuel "pending its ultimate disposal." *Id.*, at 74694, 74703; 10 CFR § 72.42.

Soon thereafter, Congress passed and President Reagan signed the Nuclear Waste Policy Act of 1982, 96 Stat. 2201, 42 U. S. C. § 10101 *et seq.* That Act directed the Department of Energy to build a geologic repository to permanently dispose of the Nation's spent nuclear fuel. See 42 U. S. C. §§ 10131–10145. Importantly, the Act did not disturb the Commission's 1980 regulations allowing both on-site and off-site private storage facilities.

The U. S. Court of Appeals for the D. C. Circuit subsequently upheld the Commission's 1980 regulations for the licensing of private off-site storage facilities. See *Bullcreek* v. *NRC*, 359 F. 3d 536, 537–538, 541–543 (2004). The D. C. Circuit reasoned that the 1980 regulations were authorized by and consistent with the 1954 Atomic Energy Act, and that the 1982 Act did not deny or repeal the Commission's authority to license private off-site storage facilities or otherwise disturb the 1980 regulations. *Ibid.* Under licenses granted

by the Commission, spent nuclear fuel is currently being stored at about 10 privately owned storage sites in the United States where there are no active nuclear reactors. Brief for United States 6.

Meanwhile, in 1987, Congress amended the 1982 Act to specify Yucca Mountain in Nevada as the permanent repository site for spent nuclear fuel. See 101 Stat. 1330–227 to 1330–228 (codified at 42 U. S. C. § 10172). But Nevada's objections and the (not coincidental) lack of appropriated funds slowed progress on the Yucca Mountain repository. And the U. S. Government eventually suspended the Yucca Mountain project. Most of the Nation's spent nuclear fuel continues to be stored on site at nuclear power plants.

C

In 2018, Interim Storage Partners, a business known as ISP, applied for a license to build a private off-site storage facility in Andrews County, Texas. Andrews County is in West Texas, northwest of Midland and north of I–20 adjacent to the Texas–New Mexico border. The Nuclear Regulatory Commission published a notice in the Federal Register. 83 Fed. Reg. 44070 (2018). Several entities sought to intervene in the licensing proceeding, including Fasken, which grazes cattle and operates oil and gas wells in West Texas. Fasken objected to the proposed facility and raised various concerns, including possible environmental contamination and harm to endangered species.

The Commission denied Fasken's petition to intervene. The Commission's regulations require would-be intervenors to, among other things, proffer a sufficient "contention," which means "sufficient information to show that a genuine dispute exists with the applicant/licensee on a material issue of law or fact." 10 CFR § 2.309(f). After holding two days of oral argument on various intervention petitions, the Commission's Atomic Safety and Licensing Board Panel ruled that Fasken (and several other would-be intervenors) had

not satisfied the requirements for intervention. The full Commission affirmed.

Fasken then sought review in the D. C. Circuit, challenging the Commission's denial of intervention. Fasken did not argue that the regulations were inconsistent with the statute. Rather, it contended that, under the regulations, it had a right to intervene. The D. C. Circuit decided that Fasken was not entitled to intervene. *Don't Waste Mich.* v. *NRC*, 2023 WL 395030 (Jan. 25, 2023). Fasken did not seek en banc review of the denial of intervention, nor did it petition for certiorari in this Court.

In May 2020, the Commission issued a draft environmental impact statement, or EIS, as required by the National Environmental Policy Act, 83 Stat. 852, as amended, 42 U. S. C. § 4321 *et seq.* See 10 CFR § 51.10 *et seq.* A Texas government agency and Fasken both commented on the draft EIS. App. 125, 205. The Texas agency contended that the proposed facility was creating "significant unease with the public" and that the Commission had done too little to prevent the facility from becoming a *de facto* permanent storage site. *Id.*, at 205. Fasken argued that the facility created an unacceptably high risk of environmental contamination. *Id.*, at 126; see also *id.*, at 128–146, 198–199. In July 2021, the Commission published its final EIS.

In September 2021, the Commission granted ISP a license to build and operate its proposed off-site facility for storage of spent nuclear fuel. *Id.*, at 284–287. Texas and Fasken then sued in the Fifth Circuit, arguing that the Commission lacked statutory authority to license storage of spent nuclear fuel at a private off-site facility.

The Fifth Circuit vacated ISP's license. 78 F. 4th 827, 831 (2023). First, notwithstanding that the Hobbs Act limits jurisdiction to a "party" aggrieved and that neither Fasken nor Texas successfully intervened as a "party" under the Atomic Energy Act, the court ruled that it could reach the merits. The Fifth Circuit reasoned that Texas and Fasken could chal-

lenge ultra vires agency action—that is, action entirely out-
side the Commission's authority—regardless of whether they
qualified as parties aggrieved under the Hobbs Act. *Id.*, at
839–840. Second, on the merits, the Fifth Circuit held that
the Commission lacked statutory authority to license a pri-
vate off-site facility for storage of spent nuclear fuel. *Id.*, at
840. In so ruling, the Fifth Circuit disagreed with the D. C.
Circuit's 2004 *Bullcreek* decision, which had held to the con-
trary. 78 F. 4th, at 841–842.

By a 9-to-7 vote, the Fifth Circuit denied rehearing en
banc. 95 F. 4th 935 (2024). The Nuclear Regulatory Com-
mission and ISP both sought review in this Court, and we
granted certiorari. 603 U. S. 949 (2024).

## II

The Hobbs Act generally allows any "party aggrieved" by
a licensing order of the Nuclear Regulatory Commission to
obtain judicial review in a federal court of appeals. 28
U. S. C. §2344. The threshold question here is whether
Texas and Fasken qualified as *parties* to the Commission
proceeding who could obtain judicial review in the Fifth
Circuit.

The Commission argues that, to become a party to a Com-
mission licensing proceeding for purposes of the Hobbs and
Atomic Energy Acts, a person or entity must either be the
license applicant or successfully intervene in the proceeding.
Because Texas and Fasken are not the license applicants and
did not successfully intervene, the Commission contends that
Texas and Fasken are not parties and cannot maintain this
suit.

Texas and Fasken disagree and advance three alternative
arguments for why they can pursue this case.

First, according to Texas and Fasken, they were parties
because both of them submitted comments to the Commis-
sion. Fasken also separately argues that it was a party be-

cause it sought to intervene in the licensing proceeding, even though it did not successfully intervene.

Second, Fasken contends that the Commission erroneously denied Fasken's intervention petition. Specifically, Fasken contends that the Commission's regulations governing intervention are inconsistent with the text of the Atomic Energy Act and set too high a bar for intervention. Fasken says that the D. C. Circuit's decision affirming the Commission's denial of Fasken's intervention petition does not preclude Fasken from relitigating the intervention issue in this litigation.

Third, Texas and Fasken claim that their statutory claims are reviewable even if they were not parties to the Commission's licensing proceeding. Agreeing with the Fifth Circuit, they argue that the Commission acted ultra vires by issuing a license to ISP, so a court may invalidate the license even if no statutory avenue for judicial review like the Administrative Procedure Act or the Hobbs Act is available.

We disagree with each of Texas's and Fasken's arguments. They were not parties to the Commission's licensing proceeding and therefore cannot obtain judicial review of the Commission's licensing decision.

### A

First, Texas and Fasken contend that simply submitting comments or attempting to intervene in the Commission's licensing proceeding suffices to qualify as a party under the Hobbs Act. Not so.

Under the Hobbs Act, only a "party" aggrieved by the licensing proceeding may seek judicial review. Importantly, a "party" aggrieved is not synonymous with a "person" aggrieved. In the Administrative Procedure Act of 1946, Congress created a general cause of action for any "person . . . aggrieved" by agency action. 5 U. S. C. § 702. But as then-Judge Scalia explained, when Congress enacted the Hobbs

Act in 1950, it "did not adopt the 'person aggrieved' standard used in the general judicial review provision of the APA, even though the features of that legislation adopted four years earlier were prominently in mind." *Simmons* v. *ICC*, 716 F. 2d 40, 43 (CADC 1983). Therefore, as Judge Scalia stated, "we must read 'party' as referring to a party before the agency." *Ibid.* Other Courts of Appeals agree with the D. C. Circuit on that point. See, *e. g., Blackstone Valley Nat. Bank* v. *Board of Governors of FRS*, 537 F. 2d 1146, 1147 (CA1 1976); *Wales Transp., Inc.* v. *ICC*, 728 F. 2d 774, 776, n. 1 (CA5 1984); *Packard Elevator* v. *ICC*, 808 F. 2d 654, 655 (CA8 1986); *Sierra Club* v. *NRC*, 825 F. 2d 1356, 1360 (CA9 1987).

The question then is how one becomes a party in a Commission licensing proceeding. Texas and Fasken emphasize ordinary dictionary definitions of "party," such as "participator." *E. g.*, 11 Oxford English Dictionary 281–282 (2d ed. 1989); see Random House Dictionary of the English Language 1052–1053 (1966) ("participant"). According to Texas and Fasken, they "participated" and became parties by filing comments or attempting to intervene.

But the text of the Atomic Energy Act indicates that one must be the license applicant or successfully intervene in order to obtain party status in a Commission licensing proceeding. That Act provides: "In any proceeding under this chapter, for the granting . . . of any license . . . the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and *shall admit any such person as a party to such proceeding.*" 42 U. S. C. § 2239(a)(1)(A) (emphasis added). That text means that a "person" becomes a "party" only after that person requests to participate in a hearing before the Commission—that is, requests to intervene—and is actually "admit[ted] . . . to such proceeding" by the Commission. *Ibid.* It follows that if the Commission fails to

"admit" someone "as a party," that person or entity is not a party.[1]

Texas responds that the text of the Hobbs Act does not distinguish between rulemaking and adjudicative proceedings. So as Texas sees it, the same participation that confers party status in an agency rulemaking—namely, filing a comment—should suffice to qualify for party status in an agency adjudication such as a Commission licensing proceeding. We disagree with that "lowest common denominator" approach to party status. Tr. of Oral Arg. 85. The Hobbs Act applies to a variety of agency actions, and what suffices for party status in one category of proceeding may be inadequate in another. Here, the text of the Atomic Energy Act makes clear that a person or entity must be granted intervention in order to become a "party" to a Commission licensing proceeding, even if something less than intervention may suffice in other proceedings such as rulemakings (or perhaps certain less-formal agency adjudications) that are also governed by the Hobbs Act.

Because the Atomic Energy Act confines party status to license applicants and intervenors, we also reject Texas's argument, advanced for the first time at oral argument, that the Commission in effect offered party status to those who submitted comments on the draft EIS. *Id.*, at 86–88. By way of comparison, participation by *amici* in a court proceeding does not make the *amici* parties, even if the court invited such participation. See *United States ex rel. Eisenstein* v. *City of New York*, 556 U. S. 928, 933 (2009). So too in Commission licensing proceedings under the Atomic Energy Act.

_____

[1] To be sure, if the Commission errs in denying intervention, the denied person or entity may obtain judicial review of the denial of intervention (as Fasken did here in the D. C. Circuit). But until one is granted intervention either by the Commission directly or following a reviewing court's decision, that person or entity is not a "party" and cannot obtain judicial review of the Commission's licensing decision under the Hobbs Act.

Where judicial review of an underlying agency action is not otherwise available, an entity cannot bootstrap its way into judicial review of that action simply by commenting on a draft EIS, even if invited to do so.

To be clear, Texas and Fasken could (and did) submit information and views to the Commission that the Commission could analyze in its decisionmaking process—not unlike an *amicus* brief in a court proceeding. But that level of participation does not equate to party status in this statutory scheme.

In light of the statutory text and context, those who were not license applicants or granted intervention in the Commission's licensing proceeding do not qualify as parties who can obtain judicial review under the Hobbs Act.

B

Second, Fasken asserts (as does the dissent) that, in any event, Fasken satisfied the statutory criteria for intervention under the Atomic Energy Act—and thus should have been granted intervention by the Commission. And Fasken contends that the D. C. Circuit's decision upholding the Commission's denial of intervention in earlier litigation does not preclude it from now relitigating that issue in the Fifth Circuit and this Court. We disagree.

The Atomic Energy Act generally provides that the Commission "shall admit" any person who requests a hearing and "whose interest may be affected by the proceeding." 42 U. S. C. § 2239(a)(1)(A). The Commission's regulations governing intervention in turn require intervenors to meet several specific criteria. For example, the Commission directs intervenors to proffer a "contention" that creates a "genuine dispute . . . on a material issue of law or fact." 10 CFR § 2.309(f) (2024). In 1990, the D. C. Circuit upheld the Commission's intervention regulations as consistent with the Atomic Energy Act, including § 2239. See *Union of Concerned Scientists* v. *NRC*, 920 F. 2d 50, 51–56.

Opinion of the Court

According to Fasken (and the dissent), the Commission's regulations set a higher bar for intervention than the Atomic Energy Act contemplates. In 1990, the D. C. Circuit rejected that argument. See *ibid.* In any event, that question is not before us in this case. Fasken could (and already did) obtain judicial review in the D. C. Circuit of the denial of its petition to intervene. See § 2239(b)(1). In the D. C. Circuit, Fasken did not question the legality of the Commission's intervention regulations. See *Don't Waste Mich.* v. *NRC*, 2023 WL 395030 (Jan. 25, 2023). Fasken simply challenged how the Commission applied its regulations in this case. But the D. C. Circuit rejected Fasken's arguments. And Fasken did not seek en banc review in the D. C. Circuit or certiorari in this Court. The decision on intervention is final.

Fasken cannot now use a new Hobbs Act suit to collaterally attack the D. C. Circuit's prior ruling on intervention. An analogy to judicial proceedings is instructive. In the judicial context, "intervention is the requisite method for a nonparty to become a party to a lawsuit." *Eisenstein*, 556 U. S., at 933. And "only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment." *Marino* v. *Ortiz*, 484 U. S. 301, 304 (1988) (*per curiam*).

Therefore, a nonparty who wishes to appeal from a district court decision ordinarily must seek to intervene in the district court proceeding. If the district court denies that intervention motion, the nonparty may appeal the denial of intervention. But the nonparty may not obtain appellate review of any final order of the district court in the underlying proceeding unless and until the denial of intervention is reversed. See *ibid.*

So too in Commission proceedings. If a request to intervene fails before the Commission, the would-be intervenor may seek judicial review of that decision—as Fasken did in the D. C. Circuit. But a person who has not successfully intervened before the Commission may not, as a nonparty,

bring a Hobbs Act suit contesting the merits of orders issued in the underlying Commission proceeding.

Texas and Fasken complain that the Commission is unilaterally denying access to judicial review by limiting intervention. That charge rings hollow. Texas did not even seek to intervene in the Commission's licensing proceeding. As for Fasken, the Commission's gatekeeping decision denying it intervention was subject to judicial review in the D. C. Circuit. After losing there, Fasken chose not to seek en banc review or further review in this Court.

In short, the Hobbs Act affords judicial review to those who were parties before the Commission. Here, obtaining party status required Texas or Fasken to successfully intervene in the Commission proceeding. Because neither Texas nor Fasken successfully intervened, they may not obtain judicial review of the Commission's licensing decision under the Hobbs Act.

C

Third, Texas and Fasken alternatively argue that they need not be parties in order to bring claims of ultra vires agency action. That argument was the basis of the Fifth Circuit's decision. (Notably, the dissent today does not adopt that argument.)

Before enactment of the APA, those challenging agency action often lacked a statutory cause of action. Yet courts sometimes entertained "a bill in equity to attack administrative action when no statutory review was available." 3 K. Hickman & R. Pierce, Administrative Law § 20.7, p. 2600 (7th ed. 2024). In particular, courts recognized a right to equitable relief where an agency's action was ultra vires—that is, "unauthorized by any law and . . . in violation of the rights of the individual." *American School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94, 110 (1902).

According to Texas and Fasken, judicial-review statutes like the Hobbs Act and the APA did not displace pre-existing nonstatutory ultra vires review. And they say that they

may assert ultra vires claims here. They contend that the
Commission's issuance of a license to ISP was ultra vires
because the Commission's licensing authority, in their view,
does not extend to private *off-site* facilities for the storage
of spent nuclear fuel.

This Court's leading case on post-APA ultra vires review
is *Leedom* v. *Kyne*, 358 U. S. 184 (1958). That case arose
from an improper agency certification of a collective bargain-
ing unit—an interlocutory order not subject to review under
the judicial-review provisions of the APA or the National
Labor Relations Act. See *id.*, at 185, 187. This Court held
that nonstatutory review was available because the agency
order at issue "was an attempted exercise of power that had
been specifically withheld," and the agency's order violated
a "specific prohibition" in the Act. *Id.*, at 188–189.

Because ultra vires review could become an easy end-run
around the limitations of the Hobbs Act and other judicial-
review statutes, this Court's subsequent cases have strictly
limited nonstatutory ultra vires review to the "painstakingly
delineated procedural boundaries of *Kyne.*" *Boire* v. *Grey-
hound Corp.*, 376 U. S. 473, 481 (1964). "The *Kyne* exception
is a narrow one," and it does not apply simply because an
agency has arguably reached "a conclusion which does not
comport with the law." *Ibid.* Rather, it applies only when
an agency has taken action entirely "in excess of its dele-
gated powers and contrary to a *specific prohibition*" in a
statute. *Railway Clerks* v. *Association for Benefit of Non-
contract Employees*, 380 U. S. 650, 660 (1965).

Ultra vires review is also unavailable if, as is usually the
case, a statutory review scheme provides aggrieved persons
"with a meaningful and adequate opportunity for judicial re-
view," or if a statutory review scheme forecloses all other
forms of judicial review. *Board of Governors, FRS* v.
*MCorp Financial, Inc.*, 502 U. S. 32, 43 (1991); see *id.*, at 44.

Given all that, "a *Leedom v. Kyne* claim is essentially a
Hail Mary pass—and in court as in football, the attempt

rarely succeeds." *Nyunt* v. *Chairman, Broadcasting Bd. of Governors*, 589 F. 3d 445, 449 (CADC 2009).

For at least two reasons, Texas's and Fasken's ultra vires claims under *Leedom* v. *Kyne* fall far short here.

First, Texas and Fasken basically dress up a typical statutory-authority argument as an ultra vires claim. That is a fairly common maneuver when a litigant tries to squeeze its arguments into the *Leedom* v. *Kyne* box—and is in large part why those claims rarely succeed. Here, Texas and Fasken contend that the Commission's general authority to license storage of spent nuclear fuel does not extend to the licensing of private off-site storage. In 2004, the D. C. Circuit rejected that statutory argument. See *Bullcreek* v. *NRC*, 359 F. 3d 536, 537–538, 541–543. Even if one were to disagree with the D. C. Circuit's conclusion, the statutory argument falls well shy of a meritorious *Leedom* v. *Kyne* claim. See 358 U. S., at 189.

Second, and alternatively, ultra vires review is not available because Texas and Fasken had an alternative path to judicial review. Entities like Texas and Fasken who seek to intervene are guaranteed judicial review of either the Commission's denial of intervention or, if intervention has been granted, the Commission's final order arising from the licensing proceeding.

Also, Texas and Fasken's theory of ultra vires review would lead to major anomalies. For example, the Fifth Circuit purported to exercise original—rather than appellate—jurisdiction over these ultra vires claims. But as counsel for Fasken acknowledged at oral argument, no precedent supports bringing an ultra vires claim in a court of appeals in the first instance, rather than in a district court. Tr. of Oral Arg. 76.

In addition, Fasken argues (and Texas does not dispute) that the Hobbs Act's 60-day time limit for seeking judicial review would apply even under its ultra vires theory. Brief

for Respondent Fasken 45. But Fasken does not explain how it makes sense for an ultra vires claim to be limited by the 60-day requirement yet not by the "party aggrieved" requirement in the very same sentence of the Hobbs Act.

We need not further prolong the discussion. Texas and Fasken may not maintain a nonstatutory ultra vires claim.

## D

### 1

The dissent primarily focuses *not* on the threshold Hobbs Act reviewability issue on which we rest our decision, but rather on the ultimate merits question raised by Texas and Fasken: Whether the Commission possessed statutory authority to issue a license to ISP. According to the dissent, that merits question is "not hard" because, in its view, the Nuclear Waste Policy Act of 1982 authorizes the storage of spent fuel only at private *on-site* facilities or at federal facilities—but not at private *off-site* facilities. *Post*, at 698 (opinion of GORSUCH, J.).

Because Texas and Fasken have no right to judicial review of the licensing proceeding, the Court today need not and does not decide that statutory interpretation question. But we do briefly note, in response to the dissent's narrative, that history and precedent offer significant support for the Commission's longstanding interpretation. Contrary to the dissent, the Commission for about 50 years has read the Atomic Energy Act of 1954 to authorize storage of spent nuclear fuel at private off-site facilities. And this Court in 1983 and several Courts of Appeals have similarly interpreted the Atomic Energy Act of 1954 to authorize licenses for the storage of spent nuclear fuel. See *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 207, 217 (1983); *Bullcreek*, 359 F. 3d, at 538 (collecting cases and stating that "it has long been recognized that the AEA confers on the NRC authority to

license and regulate the storage and disposal of" spent nuclear fuel).[2]

To spell it out some more: In 1980, the Commission adopted regulations that interpreted the 1954 Atomic Energy Act to authorize storage at private off-site facilities. Those regulations established licensing procedures for private on-site and off-site facilities. See 10 CFR pt. 72. In adopting those regulations, the Commission made clear that it was not claiming new authority, but instead was codifying "certain existing regulatory practices and better defin[ing] licensing requirements covering the storage of spent fuel in" on-site and off-site facilities under the Atomic Energy Act. 45 Fed. Reg. 74693 (1980).

In the ensuing 45 years, the Commission's regulations have continued to authorize storage of spent nuclear fuel, including at private off-site facilities. And both before and after the Commission's 1980 regulations, the Commission has in fact licensed those facilities. For example, one such facility, the GE Morris facility in Morris, Illinois, received a license in 1971 and obtained a renewed license following the 1980 regulations. See *In re General Elec. Co.*, 22 N. R. C. 851, 853–854 (1985). Today, there are about 10 privately owned storage sites where there are no active nuclear reactors.

---

[2] The dissent says that *Pacific Gas* "never decided that question" and *Bullcreek* "had no occasion to resolve" it. *Post*, at 704. In *Pacific Gas*, however, this Court noted that the Commission extensively regulates spent fuel storage under the Atomic Energy Act, and the Court relied on that fact in reasoning that "nuclear waste disposal" is a regulatory "field . . . occupied by the Federal Government." 461 U. S., at 219; see also *id.*, at 217. And *Bullcreek* reaffirmed—without relying on *Chevron* deference—that the Commission has "authority under the AEA to license and regulate private use of private away-from-reactor spent fuel storage facilities." 359 F. 3d, at 542; see also *id.*, at 541 (disclaiming any reliance on *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984)).

Importantly, in 1982 when enacting the heavily negotiated Nuclear Waste Policy Act, Congress was of course fully aware of the 1954 Atomic Energy Act and the Commission's 1980 regulations authorizing private off-site storage of spent nuclear fuel—as well as the existence of private off-site storage facilities like the GE Morris facility. See S. Rep. No. 97–282, pp. 44, 65 (1981); *In re Private Fuel Storage, LLC*, 56 N. R. C. 390, 400 (2002) ("Members of Congress clearly were well aware that 'other provisions of law' authorized private AFR [away-from-reactor] storage facilities, as the existence, and fate, of such facilities was discussed in congressional committee debates").

In that 1982 Act, Congress did not disturb the Commission's 1980 regulations or its practice of licensing temporary private off-site facilities under the Atomic Energy Act. In § 135(h) of that Act (which the dissent cites, see *post*, at 692, 698), Congress set forth guidelines for construing "this chapter" of the 1982 Act but did not speak one way or another about the Commission's existing licensing authority under the 1954 Act. 42 U. S. C. § 10155(h). Instead, in the 1982 Act, Congress primarily focused on authorizing a permanent nuclear waste repository that would exist for thousands of years.

When a license for a private off-site storage facility was later challenged in the D. C. Circuit, that court upheld the license and the Commission's 1980 regulations, finding them to be consistent with the 1954 Atomic Energy Act and the 1982 Act. *Bullcreek*, 359 F. 3d, at 537–538, 541–543. The D. C. Circuit reasoned that courts, including the Supreme Court, had "long . . . recognized" that the Atomic Energy Act "confers on the NRC authority to license and regulate the storage and disposal of such fuel," including at private off-site facilities. *Id.*, at 538. Then, after considering the text and structure of the 1982 Act, the D. C. Circuit further concluded that the 1982 Act's "text . . . demonstrates that Congress did not intend to repeal or supersede the NRC's

authority under the AEA to license and regulate private use of private away-from-reactor spent fuel storage facilities." *Id.*, at 542.

The dissent today first argues, however, that the Commission never had authority under the 1954 Atomic Energy Act to license *on-site or off-site* storage facilities. See *post*, at 699–702. But this Court has already rejected that interpretation of the Act. See *PG&E*, 461 U. S., at 207, 217; see also *Bullcreek*, 359 F. 3d, at 538.

And the dissent's theory that the Atomic Energy Act does not authorize storage of spent nuclear fuel *anywhere* would have extraordinary consequences. As was pointed out at oral argument, if that interpretation were correct, then it also would necessarily mean that private off-site facilities actually do not need a license to store spent nuclear fuel in the first place. (That is because, if spent nuclear fuel is not covered by the 1954 Act, then it follows that the Act does not prohibit its possession or use.) If that were the case, petitioner ISP could build the West Texas facility without even bothering to seek a license from the Commission. Although ISP might benefit somewhat from such a novel reading, it forthrightly stated at oral argument that "that's not a credible interpretation of the Atomic Energy Act." Tr. of Oral Arg. 43.[3]

Regardless of the scope of the 1954 Atomic Energy Act, the dissent next says that the 1982 Act restricted storage of spent nuclear fuel to on-site and federal facilities. But as the D. C. Circuit explained in *Bullcreek*, the 1982 Act carefully avoided denying or repealing the Commission's authority to license private off-site facilities. See 359 F. 3d, at 542.

---

[3] The dissent responds that the 1982 Act "addressed spent nuclear fuel directly, and that statute authorizes its storage in only two locations." *Post*, at 705. But the 1982 Act in relevant part simply grants the Commission authority additional to the 1954 Act to authorize storage of spent nuclear fuel. See 42 U. S. C. § 10155(a).

On that issue, the 1982 Act left the law where it was—namely with the 1954 Atomic Energy Act and the 1980 Commission regulations authorizing licensing of private off-site storage facilities.   See *ibid.*

In short, the 1982 Act did not withdraw or displace the Commission's authority under the Atomic Energy Act (and the 1980 regulations) to authorize private off-site storage. On the contrary, the 1982 Act preserved pre-existing law on that issue.   Simply put, the dissent seems to underread the 1954 Atomic Energy Act and to overread the 1982 Act.

Given all of that, it is perhaps no surprise that neither Fasken's intervention petition to the Commission nor Texas's comments to the Commission questioned the Commission's statutory authority to license private off-site storage of spent nuclear fuel.   They raised other issues, but they did not question the Commission's statutory authority to issue a license for private off-site storage.

To be clear, because Texas and Fasken's claims are not judicially reviewable, we need not and do not decide the ultimate question of statutory authority that the dissent focuses on.   So that there is no confusion, however, we underscore that in resting on the threshold reviewability issue, we are *not* somehow assuming or buying into a premise that the Commission is wrong on the underlying merits.   The dissent's description of an agency that is flagrantly violating its governing statutes seems to be in substantial tension with about 50 years of consistent congressional action, agency practice, and judicial interpretation.

2

When it turns to the Hobbs Act reviewability question on which our decision rests, the dissent's analysis is unpersuasive, in our respectful view.

Under the Hobbs Act, as we have explained and the dissent acknowledges, Texas and Fasken may obtain judicial re-

view of the licensing decision only if they were *parties* to the Commission's licensing proceeding. See *post*, at 707. The Atomic Energy Act—in particular, 42 U. S. C. § 2239—pre-scribes how one becomes a party to a Commission licensing proceeding. Under § 2239, to be a party, one must either be the license applicant or be admitted by the Commission as a party (that is, be granted intervention).

The dissent claims that § 2239 is not the exclusive way to become a "party" to a Commission licensing proceeding. See *post*, at 709. We disagree. Section 2239 provides that "[i]n any *proceeding*" for granting a license, "the Commission shall grant a *hearing* upon the request of any person whose interest may be affected by the *proceeding*, and shall admit any such person as a party to such *proceeding*." § 2239(a)(1)(A) (emphasis added). As the dissent seems to acknowledge, when § 2239 uses the word "proceeding" rather than "hearing," it refers to the Commission's "overall licensing proceeding"—not merely one subpart of that proceeding. *Post*, at 709. And § 2239 specifies intervention as the mecha-nism for a person other than the license applicant to become "a party to such proceeding"—that is, to the Commission's overall licensing proceeding. For that person or entity to qualify as a party, the Commission must admit that person or entity as a party.[4]

---

[4] Even if § 2239 were not the exclusive path to party status in Commis-sion licensing proceedings, Texas and Fasken would still not be parties under the Hobbs Act. The dissent suggests that Texas and Fasken could achieve party status for purposes of the Hobbs Act merely by commenting on the Commission's draft EIS. See *post*, at 707–708. That contention—that every interested commenter *in an agency adjudication* is a party for purposes of the Hobbs Act—is, as best as we can tell, unprecedented. See *supra*, at 677–678. The dissent points to no authority suggesting that a person who is not involved in an agency adjudication can bootstrap his way under the Hobbs Act into plenary judicial review of the legality of that adjudication merely by commenting on a related EIS. Rather, Courts of Appeals have long held that litigants cannot use collateral envi-

Section 2239 is thus the exclusive path to party status in Commission licensing proceedings. To be a party, one must be admitted by the Commission as a party. As we noted above, the Commission applied its regulations implementing § 2239 and denied Fasken intervention.

Importantly, if a person or entity believes that the Commission wrongly denied it intervention, then it may obtain judicial review of the intervention decision. Here, Fasken obtained such judicial review in the D. C. Circuit, but lost. It cannot get a second bite at the apple on intervention in this litigation.

The dissent responds that the Commission's intervention regulations misinterpret § 2239 and set too high a bar for intervention. See *post*, at 711. The D. C. Circuit rejected that argument 35 years ago in *Union of Concerned Scientists*. See 920 F. 2d, at 51–56. And in any event, we need not delve into that question here because, to reiterate, Fasken had an opportunity to raise that argument to the D. C. Circuit when it challenged the Commission's denial of intervention. But Fasken, though it appealed to the D. C. Circuit, did not even raise that argument in that court. Rather, it argued that it should have been admitted under the Commission's existing intervention regulations. Fasken did not prevail in the D. C. Circuit on that intervention argument. See *Don't Waste Mich.* v. *NRC*, 2023 WL 395030. And it did not seek either en banc review or certiorari. Having lost in the D. C. Circuit, Fasken cannot collaterally

ronmental claims to evade the limits on judicial review imposed by an exclusive judicial-review provision like the Hobbs Act. See, *e. g.*, *Center for Biological Diversity* v. *EPA*, 861 F. 3d 174, 186 (CADC 2017); *American Bird Conservancy* v. *FCC*, 545 F. 3d 1190, 1194–1195 (CA9 2008). In these Commission proceedings, a person or entity who comments on the EIS can petition to intervene, and if denied intervention, may appeal that denial—as Fasken did to the D. C. Circuit, where it did not prevail. But commenting on an EIS in an adjudication does not automatically make one a party under the Hobbs Act.

attack that decision here, as we have explained. See *supra*, at 679–680. (For its part, Texas did not even try to intervene in the Commission's licensing proceeding.)

The dissent exudes a sense that Texas and Fasken have been treated unfairly. But the dissent wants to give Texas and Fasken a second or third bite at the apple on the intervention issue. To review: Texas and Fasken had ample opportunity to present their views on the proposed storage site to the Commission. They did so. And they had the opportunity to try to intervene before the Commission and become a party—and after being denied, to raise their arguments for intervention on appeal to the D. C. Circuit, and if unsuccessful there, to this Court. They did not prevail (or did not try) in those forums. And having not secured intervention, they were not parties to the licensing proceeding under § 2239—and therefore under the Hobbs Act cannot obtain judicial review of the licensing decision in this litigation.

\* \* \*

Texas and Fasken were not parties to the Commission's licensing proceeding and are not entitled to obtain judicial review of the Commission's licensing decision. We reverse the judgment of the Court of Appeals and remand the cases with instructions to deny or dismiss the petitions for review.

*It is so ordered.*

JUSTICE GORSUCH, with whom JUSTICE THOMAS and JUSTICE ALITO join, dissenting.

By law, spent nuclear fuel may be stored on an interim basis in only two places: at a nuclear reactor or a federally owned facility. Disregarding those instructions, the Nuclear Regulatory Commission (NRC) issued an interim storage license to a private company, Interim Storage Partners, LLC (ISP), allowing it to store thousands of tons of spent nuclear fuel on its private property in Texas, hundreds of

miles from the nearest reactor.   The agency's decision was unlawful.

Still, the Court says, there is nothing we can do about it.   Why?   Because neither of the respondents before us is a "party aggrieved" by the agency's decision.   Yes, the respondents are the State of Texas and Fasken Land and Minerals, Ltd., a landowner with property near the proposed facility.   And, yes, they are "aggrieved" by the NRC's decision.   Radioactive waste poses risks to the State, its citizens, its lands, air, and waters, and it poses dangers as well to a neighbor and its employees.   But, the Court insists, the agency never admitted Texas or Fasken as "parties" in a hearing it held before issuing ISP's license—and that's the rub.   Maybe the agency's internal rules governing who can participate in its hearing are highly restrictive.   Maybe those rules are themselves unlawful.   But, the Court reasons, its hands are tied: The agency did not admit Texas or Fasken as parties in its hearing, and that is that.

I cannot agree.   Both Texas and Fasken participated actively in other aspects of the NRC's licensing proceeding. No more is required for them to qualify as "parties aggrieved" by the NRC's licensing decision.   Both are entitled to their day in court—and both are entitled to prevail.

I

A

At the dawn of the atomic age, few worried about where to store spent nuclear fuel.   The "prevailing expectation" was that it would be reprocessed and reused.   Brief for Federal Petitioners 3 (citing *Idaho* v. *Department of Energy*, 945 F. 2d 295, 298 (CA9 1991)).   Perhaps for that reason, Congress's first piece of major legislation regulating the nuclear power industry, the Atomic Energy Act of 1954 (AEA), 68 Stat. 919, did not address the storage of spent nuclear fuel. In fact, the AEA didn't mention spent nuclear fuel at all.

The statute spoke about nearly everything else—from the construction of commercial nuclear reactors to their ownership and operation—but not spent nuclear fuel or its storage. *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 206–207 (1983).

By the 1970s, things looked very different. Spent nuclear fuel was piling up, and there was nowhere to put it. The reprocessing industry had "collapsed." *Idaho*, 945 F. 2d, at 298. Those developments presented the Nation with an acute problem. Spent nuclear fuel is "radioactive, explosive, and highly volatile," and it can remain so for thousands of years. Brief for State of Idaho as *Amicus Curiae* 7. It can poison people and animals, render land and water unusable, and, should it fall into the wrong hands, it can be weaponized. See *id.*, at 8.

In 1982, Congress reentered the picture to address the problem, passing a new law appropriately named the Nuclear Waste Policy Act (NWPA), 96 Stat. 2201, 42 U. S. C. § 10101 *et seq.* In it, Congress tasked the Department of Energy with selecting a permanent federally owned repository for spent nuclear fuel. See §§ 10132, 10134. In the meantime, the NWPA authorized the "interim" storage of spent nuclear fuel in two—and only two—places. Spent fuel, Congress said, could be stored either "at the site of each civilian nuclear reactor" or at "facilities owned by the Federal Government." § 10151(b). In case those instructions left any room for doubt, Congress added that "nothing" in its new law "shall be construed to encourage [or] authorize" storage at offsite, private facilities. § 10155(h).

Eventually, the Department of Energy selected Yucca Mountain in Nevada to serve as the permanent repository for spent nuclear fuel. And, in 1987, Congress amended the NWPA to endorse that choice, directing that Yucca Mountain should begin operations no later than January 31, 1998. See 101 Stat. 1330–227 to 1330–228, 42 U. S. C. § 10172. Despite

GORSUCH, J., dissenting

that mandate, and "more than $15 billion" spent on the project, the Yucca Mountain repository remains today more a dream than a reality. App. 2; see *National Assn. of Regulatory Util. Comm'rs* v. *United States Dept. of Energy*, 680 F. 3d 819, 821 (CADC 2012).

That leaves the question what to do. Spent fuel must be stored somewhere. And, until recently, that somewhere has usually been where Congress directed—at reactors or federally owned facilities. Now, however, the NRC and ISP seek to experiment with a different solution.

In 2016, ISP's predecessor applied for a license to build and maintain an aboveground storage facility for at least 5,000 metric tons of spent nuclear fuel in Andrews County, Texas. App. 12. By way of reference, that is more than the amount of spent fuel currently stored at any other site in the country. Brief for Respondent Fasken 9. And ISP's plans include the possibility of storing much more on its land—up to 40,000 metric tons of spent fuel in all. 78 F. 4th 827, 843 (CA5 2023).

ISP's proposed site lies in the Permian Basin, an area about 250 miles wide and 300 miles long in western Texas and eastern New Mexico. App. 64–65. That area is "the largest producing oilfield in the world." *Id.*, at 118. It also includes aquifers that provide water to "dozens of counties in Texas and New Mexico." Brief for Respondent Fasken 8. While storing so much spent fuel on private land controlled by a private company poses serious risks, transporting the waste there will be tricky, too. The company's property lies more than 300 miles from the nearest nuclear power plant, and more than 1,000 miles from most other reactors. *Id.*, at 9.

Despite those risks, and despite the NWPA's mandate that spent nuclear fuel must be stored at reactors or federally owned sites, the NRC launched an administrative proceeding to consider ISP's request. And, at the end of it all, the agency issued a license to ISP authorizing it to store spent

fuel at its site for 40 years. In doing so, the agency left open the possibility it might choose to extend that term even further. App. to Pet. for Cert. 53a–59a; App. 175.

B

Slogging through the steps the agency took between receiving ISP's application in 2016 and rendering a final decision approving the license in 2021 makes for less than easy reading. But those steps matter because of the way the Court chooses to dispose of this case, so bear with me.

After receiving ISP's application and before it could issue any sort of license, the NRC acknowledges, it had to undertake a number of tasks. So, for example, it had to complete a "safety review to determine [the applicant's] compliance with NRC's regulations." 81 Fed. Reg. 79532 (2016). In that review, NRC staff examined the conditions of the proposed site, ISP's proposed operating systems, and the design of its proposed structures (among many other things). See NRC, Final Safety Evaluation Report for Specific Materials License No. SNM–2515 (Sept. 2021), pp. ii–xiii. The agency's final safety evaluation report was 366 pages long. See *ibid.*

But that "safety review" was just one piece of the puzzle. As the agency saw it, it also had to complete other tasks before issuing a license. Two are especially relevant here. One is what the agency called an "environmental review." See, *e. g.*, 81 Fed. Reg. 79532. The other is a hearing provided for by 42 U. S. C. §2239.

Start with the environmental review. The NRC said it could not issue a license without certifying that it had completed an environmental impact statement (EIS) that assessed "the potential environmental impacts of the proposed" license and weighed alternatives, including the possibility of "no-action." 81 Fed. Reg. 79532, 79533. To discharge that responsibility, the agency had to prepare a draft EIS, publish it, accept public comments, and provide a reasoned decision for any conclusions it reached. Brief for

GORSUCH, J., dissenting

Federal Petitioners 27 (citing §4321 *et seq.*); see also 81 Fed. Reg. 79532; 10 CFR pt. 51 (2024).

After the agency published its draft EIS for public comment, Texas answered the call. Writing on behalf of the State, Governor Greg Abbott warned that storing spent fuel on "a concrete pad" in an oilfield containing more than 40% of America's proven oil reserves would be "dangerous." App. 118. He expressed concern that an accident or an act of terrorism could harm "the entire country." *Id.*, at 122. For all these reasons and more, he asked the NRC to "deny ISP's license application." *Id.*, at 121–122. The Texas Commission on Environmental Quality also provided comments expressing concern that, by authorizing private "interim" storage for 40 years (and perhaps longer) without addressing what should happen next, the NRC was effectively ignoring Congress's directive that Yucca Mountain should become the Nation's permanent repository for spent nuclear fuel. *Id.*, at 206.

Fasken offered comments, too. Fasken owns hundreds of thousands of acres in the Permian Basin, where it grazes cattle and operates oil and gas wells. Brief for Respondent Fasken 9. In its comments, the company highlighted what, in its view, constituted "systemic regulatory failures in multiple areas of the" draft EIS. App. 126; see *id.*, at 123–168. Fasken also warned of threats "to the environment of West Texas and the Permian Basin" presented by ISP's plans. *Id.*, at 186.

When it published its final EIS, the agency explained that it was doing so "as part of the NRC's process to decide whether to issue a license to ISP." 86 Fed. Reg. 43278 (2021). Like the safety report, the final EIS was voluminous—684 pages in total, with 173 of those dedicated to summarizing and responding to comments from the public.[1] The

---

[1] See NRC, Environmental Impact Statement for Interim Storage Partners LLC's License Application for a Consolidated Interim Storage Facility for Spent Nuclear Fuel in Andrews County, Texas, Final Report, App. D (NUREG–2239, July 2021).

EIS specifically addressed Texas's and Fasken's comments.[2] And, after responding to those and other comments and weighing various alternatives, the agency concluded with a "recommendation to issue" a license to ISP. *Id.*, at 51927.

Turn now to the other task the agency said it had to complete: the § 2239 hearing. "[U]pon the request of any person whose interest may be affected by the [licensing] proceeding," that statute provides, the agency "shall grant a hearing" and "shall admit any such person as a party to such proceeding." § 2239(a)(1)(A). To comply with that mandate, the NRC published a notice in the Federal Register inviting "any persons . . . whose interest may be affected" by ISP's license to "file a request for a hearing and petition for leave to intervene." 83 Fed. Reg. 44071 (2018).

Fasken sought to take advantage of this opportunity as well. In response to the Federal Register notice, it submitted two filings: A motion to dismiss and a petition for hearing. See *In re Interim Storage Partners, LLC*, 90 N. R. C. 31, 43–44 (2019). But instead of granting Fasken a hearing, the agency invoked its own internal rules to keep the company out of that process. As the agency saw it, Fasken had failed to meet its standards for "intervention" and had failed to advance any "admissible contention" under its rules. *Id.*, at 38, 52–54, 109–118; see also 10 CFR § 2.309(f). Nor was Fasken singled out for this treatment. While the agency allowed its own staff and ISP to be heard, it effectively "denied *all* third-party participation." Brief for Pacific Legal Foundation as *Amicus Curiae* 6 (emphasis added). Fasken went back and forth with the agency several times, appealing unfavorable rulings and filing new motions, but the agency rebuffed all of its many efforts to participate. See *In re Interim Storage Partners, LLC*, 92 N. R. C. 463, 489 (2020); *In re Interim Storage Partners, LLC*, 93 N. R. C. 244 (2021).

---

[2] See *id.*, at D–21, D–24, D–25, D–29, D–34, D–37, D–49, D–91, D–93, D–95, D–97, D–100, D–150, D–153, D–159, D–162.

Eventually, Fasken went to court to challenge the agency's various decisions preventing it from obtaining a hearing under §2239.  So did others in Fasken's shoes.  The D. C. Circuit consolidated those challenges into one proceeding and dispatched them all in a short, unpublished order.  *Don't Waste Michigan* v. *NRC*, No. 21–1048 (Jan. 25, 2023) (*per curiam*).  In the only paragraph dedicated to Fasken's petition, the court concluded that the NRC had properly denied Fasken's "motion to admit a new contention and its motion to reopen the record."  *Id.*, at 4.

More than five years after the NRC began the work required to pass on ISP's application—including its safety review, environmental review, and the §2239 hearing—the agency published a final decision approving ISP's license. See 86 Fed. Reg. 51927.   The license itself consisted of a self-described "package" of materials.   See *id.*, at 51928 (referencing "Materials License for ISP, dated September 13, 2021 . . . (Package)").

That package included a preamble in which the agency recited the various findings necessary to issue the license. App. 284; cf. *id.*, at 277.   Among those findings was a conclusion that "issuance of this license is in accordance with 10 CFR Part 51 . . . and all applicable requirements [of that Part] have been satisfied."  *Id.*, at 286.   Translation: The NRC had completed a final EIS.   See 10 CFR §51.91.   Consistent with its regulations, the agency's final license package also contained a "concise public record of decision" supporting its environmental findings.  §51.102(a); see App. 288–298.   That document described the agency's findings in its final EIS, including its recommendation that "the proposed license [should] be issued to ISP."  *Id.*, at 288.   The record of decision also "incorporate[d] by reference the materials contained in" the final EIS itself.  *Id.*, at 289; see 10 CFR §51.103(c).

After the agency issued its decision, Texas and Fasken petitioned the Fifth Circuit for review, arguing that the NRC

lacked legal authority to license ISP's facility.  That court agreed with Texas and Fasken and vacated the NRC's decision.  78 F. 4th, at 844.  The agency and ISP then sought review of the Fifth Circuit's decision, and we agreed to take the cases.  603 U. S. 949 (2024).

## II

With that background in mind, turn first to the question whether the NRC may license a private company to store spent nuclear fuel, not at a reactor or on federal land, but on its own private property.  This "interim" license runs for 40 years—subject to renewal.  Can the agency lawfully issue such a license?

## A

The answer is not hard to come by.  The NWPA authorizes only two places where spent nuclear fuel may be stored on an "interim" basis—at reactor sites or on federal property.  See 42 U. S. C. §§ 10151–10157.  When it comes to that direction, Congress was clear as it could be, adding that "nothing in [the NWPA] shall be construed to encourage [or] authorize" storage at any "facility located away from the site of any civilian nuclear power reactor and not owned by the Federal Government."  § 10155(h).

Given Congress's emphatic instructions, how did the NRC come to the view that it possesses authority to do what the NWPA forbids?  It's a convoluted story.  Before the NWPA's adoption in 1982, the agency observes, the AEA represented Congress's primary legislation in the field of civilian nuclear power.  And, the agency says, it issued regulations pursuant to that statute in 1980 contemplating licenses like ISP's.  See 45 Fed. Reg. 74693; Brief for Federal Petitioners 4.  Congress, the agency continues, must have been aware of those regulations when it adopted the NWPA in 1982.  So, the agency reasons, Congress cannot have meant for its new legislation to disturb them.  See *id.*, at 30–48; Brief for Petitioner ISP 29–42.  As a result, the NRC

says, it was entitled to rely on those regulations to issue ISP's license.

That argument is unpersuasive. Agencies are creatures of statute, and they have no authority to dispense licenses except as Congress provides. See *West Virginia* v. *EPA*, 597 U. S. 697, 723 (2022). And nothing in the AEA authorizes the NRC to license the storage of spent nuclear fuel at private, offsite facilities like ISP's. Just recall: At the time of the AEA's enactment in 1954, most assumed that spent nuclear fuel would be reprocessed and reused, not stored for millennia. See Part I–A, *supra*. Reflecting that assumption, the AEA did not even mention spent nuclear fuel, let alone address its storage. *Ibid.* Congress first provided for the storage of spent nuclear fuel only in 1982, with the adoption of the NWPA. And that statute forbids, not authorizes, licenses like ISP's.

In the past, the NRC itself has acknowledged as much. In 1978, the agency's chairman recognized that the AEA did "not explicitly authorize regulation of radioactive waste facilities." NRC, Regulation of Federal Radioactive Waste Activities, p. G–9 (NUREG–0527, Sept. 1979); see also Brief for Respondent Fasken 3. And in the same 1980 regulations the NRC now seeks to rely upon to issue a license to ISP, the agency conceded that the need for a place to store "spent fuel . . . for a number of years" became apparent only "[f]ollowing the President's deferral of reprocessing of spent fuel in April 1977." 45 Fed. Reg. 74693.

B

To be sure, the NRC (now) has a theory why the AEA authorizes it to issue regulations regarding the storage of spent nuclear fuel and grant licenses like ISP's. The agency points to three provisions of the AEA that allow it to issue licenses to entities seeking to "possess . . . special nuclear material," § 2073(a), "distribute source material," § 2093(a), or "use byproduct material," § 2111(a). And, the agency

submits, if you cobble together "special," "source," and "by-product" material, you wind up with spent nuclear fuel. See Brief for Federal Petitioners 31–32. So while the AEA may not contain a single provision addressing the storage of spent nuclear fuel, the agency insists, taken collectively these three provisions effectively authorize it to issue regulations and licenses regarding the storage of spent nuclear fuel. *Ibid.*

The agency's theory may get marks for creativity, but it fails for at least three independent reasons.

*First*, it's hard to see how the power to license the use of "special," "source," and "byproduct" material amounts to a power to license the storage of spent nuclear fuel. In briefing before us, even the agency admits that spent fuel "is a substance different from any one of its constituent parts," Reply Brief for Federal Petitioners 13, n. 2. And Congress itself has defined those terms very differently. Under the NWPA, spent nuclear fuel must "ha[ve] been withdrawn from a nuclear reactor following irradiation" and must not have undergone "reprocessing." § 10101(23). Meanwhile, the AEA's detailed definitions of special, source, and byproduct materials include neither of these requirements. See §§ 2014(e), (z), (aa).

Elsewhere, too, Congress has distinguished spent nuclear fuel from special, source, and byproduct materials. While the AEA as enacted in 1954 said nothing about "spent nuclear fuel," in 1988 Congress amended that law to incorporate the NWPA's definition of the term. See 102 Stat. 1069. So, today, the AEA authorizes the NRC to ensure that certain "*byproduct* materials, *source* materials, *special* nuclear materials, [and] *spent nuclear fuel*" transferred in the United States are done so in a specific manner. § 2210i(b) (emphasis added). If the agency were right, and spent nuclear fuel really is just the sum of special, source, and byproduct materials, Congress's inclusion of the phrase "spent nuclear fuel" would have been meaningless. And we do not

usually presume that Congress takes the trouble to amend its laws to add words and phrases that perform no work. See *Duncan* v. *Walker*, 533 U. S. 167, 174 (2001); A. Scalia & B. Garner, Reading Law 174–179 (2012).

If more evidence were needed, the 1980 regulations on which the NRC now seeks to rely would provide it. There, the agency explained its view that "[s]pent fuel includes the special nuclear material, byproduct material, source material, *and other radioactive materials associated with fuel assemblies*." 45 Fed. Reg. 74700–74701 (emphasis added). Even in the 1980 regulations the agency invokes to justify ISP's license, then, the agency itself admitted that spent nuclear fuel includes materials *besides* special, source, and byproduct materials. The agency cannot have it both ways.

*Second*, the AEA authorizes the NRC to license the use of special, source, and byproduct materials only for very specific purposes—and storage is not among them. So, for example, the AEA says that the agency may grant licenses for the possession of "special nuclear material" for activities like "research and development," "medical therapy," and industrial or commercial purposes. §§ 2073(a)(1)–(3); see § 2133. The provisions speaking to "source material" and "byproduct material" contain similar lists of approved uses. See §§ 2093(a), 2111(a). None of those lists discusses storage as an approved use.

The agency admits that the AEA does not expressly authorize it to issue licenses for storage. See Brief for Federal Petitioners 32–34. But, it replies, the statute does so implicitly. For support, the agency points to the fact that the provisions discussing "special," "source," and "byproduct" material each contain a "catchall." *Ibid.* So, for example, § 2073(a) authorizes the agency to license the possession of "special nuclear material" not just for medical research and the like, but also for "such other uses as the Commission determines to be appropriate to carry out the purposes of

this chapter." And, the agency says, it has determined it "appropriate" to issue licenses for the "interim" storage of spent fuel to private companies like ISP. See *id.*, at 32.

That hardly works. As this Court has repeatedly recognized, a catchall "at the end of a list of specific items is typically controlled and defined by reference to the specific classes that precede it." *Fischer* v. *United States*, 603 U. S. 480, 487 (2024) (internal quotation marks and ellipsis omitted); accord, *Yates* v. *United States*, 574 U. S. 528, 545 (2015) (plurality opinion). So, the catchalls before us cannot be read as permission to the NRC to go forth and do good. Instead, they must be read in light of, and consistently with, the lists that precede them. And here, all of the activities listed in § 2073, § 2093, and § 2111 involve the affirmative, productive use of the materials in question—not their passive storage.

*Third*, even assuming (against all the evidence) that the AEA once might have implicitly authorized the NRC to grant licenses like the one at issue here, it cannot be fairly read to do so after Congress adopted the NWPA in 1982. If the AEA spoke at all to the storage of spent nuclear fuel, it did so elliptically and without offering any specifics about what sort of storage might be appropriate. The NWPA, by contrast, speaks directly to spent nuclear fuel and the question of its storage. In doing so, that law makes plain that only two kinds of "interim" storage sites are permissible. And knowing that much is enough to know that the NWPA must govern, for it is a "familiar" rule of statutory construction "that a specific statute controls over a general one." *Bulova Watch Co.* v. *United States*, 365 U. S. 753, 758 (1961); accord, *Morton* v. *Mancari*, 417 U. S. 535, 550–551 (1974); contra, *ante*, at 686, n. 3 (mistakenly suggesting in dicta that the NWPA "simply grant[ed]" the NRC "additional" authority).

Really, any other conclusion would make a mockery of Congress's work in the NWPA and risk rendering it a dead

letter.    What was the point of legislation specifying two and only two appropriate sites for the interim storage of spent fuel if the NRC possesses the power to authorize interim storage wherever it thinks best?   And what was the point of Congress later amending the NWPA to authorize one and only one permanent storage site if nothing prevents the NRC from issuing 40-year "interim" licenses and renewing them indefinitely?   If there are answers to those questions, the agency has not supplied them.

In short, Texas and Fasken are right.   The law does not permit the NRC to license private companies to store spent nuclear fuel at private, away-from-reactor facilities.   The NWPA expressly prohibits that course.  And cobbled-together terms addressing other matters in the AEA cannot be repurposed to authorize what the NWPA forbids. Should Congress choose, it could grant the agency the power it seeks.   But there are obvious and grave risks associated with transporting highly radioactive material across the country and entrusting it to a private company operating on private property.   And it belongs to Congress, not the agency, to assess those risks in the first instance.

C

Despite insisting that we lack jurisdiction to reach the merits of Texas's and Fasken's claim, the Court proceeds to devote a healthy section of its opinion to the merits anyway. See Part II–D–1, *ante.*   That is surely a curious choice, for anything the Court might say about the merits of a case over which it lacks jurisdiction is pure dicta.   Cf. *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 94–95 (1998). Maybe worse, the Court's dicta is simply wrong.   The Court argues that the NRC's decision to issue a license to ISP is justified by "history and precedent."   *Ante,* at 683.   Yet neither the Court's (revisionist) history nor its (irrelevant) precedent can imbue the NRC with novel authority that appears nowhere in any statute.

Take precedent first.   According to the Court, we and others have "interpreted the Atomic Energy Act of 1954 to authorize licenses for the storage of spent nuclear fuel."   *Ibid.* In truth, this Court has never decided that question.   Our decision in *Pacific Gas* simply acknowledged that the NRC in 1980 "promulgated detailed regulations governing storage and disposal away from the reactor"—an undisputed fact about regulations no one had challenged—along the way to holding that neither the AEA nor those regulations preempted a California statute pausing in-state construction of new nuclear plants until more spent-fuel storage became available.   416 U. S., at 217, 219.   As for the lower courts, the best the Court can muster is a D. C. Circuit case that had no occasion to resolve whether the AEA authorizes the NRC to license private, offsite storage, for the parties there "conceded [that] the NRC" had just such "authority" under the 1954 statute.   See *Bullcreek* v. *NRC*, 359 F. 3d 536, 542 (2004).

History doesn't get the Court any further.   As the Court sees it, the NRC must have the power to issue licenses to facilities like ISP's because it has done so in the past.   But no agency can exercise power without lawful authority, and repeating a wrong does not make it right.   Notice, too, what the Court has to say about the agency's past practices: "[T]here are about 10 privately owned storage sites where there are no active nuclear reactors."   *Ante,* at 684.   That careful phrasing obscures that none of those facilities is anything like ISP's.   Eight facilities seemingly included in the Court's count are not "offsite" storage sites at all, but "privately owned nuclear reactor sites that have ceased . . . reactor operations."   Brief for Federal Petitioners 6.   Meanwhile, the GE Morris facility was initially built to serve as a reprocessing facility and only became a storage facility by default after reprocessing collapsed.   See Brief for Don't Waste Michigan et al. as *Amici Curiae* 12.   That leaves just one example where it appears the NRC has in-

voked its 1980 regulations to license a private, offsite storage facility—and that facility "was never built." See Tr. of Oral Arg. 81. I struggle to see in any of this the "significant support" the Court claims for what the agency did here. *Ante,* at 683.

One other aspect of the Court's merits analysis warrants mention. In the Court's view, if the AEA did not authorize the NRC to issue a license to ISP, that would mean private individuals and companies could store spent nuclear fuel anywhere and do so without a license. See *ante,* at 686. That conclusion does not follow for at least two reasons. First, as we have seen, in 1982 the NWPA addressed spent nuclear fuel directly, and that statute authorizes its storage in only two locations. Second, even before the NWPA, when most thought spent nuclear fuel would be reprocessed, the AEA was not blind to the fact that nuclear reactors would generate spent fuel, nor did the AEA tolerate its storage by anyone "anywhere."

To the contrary, the AEA authorized the NRC to license reactor facilities only so long as they could be operated safely. See, *e. g.,* 68 Stat. 936–937. Before issuing a license consistent with that mandate, the NRC understood, it had to determine that a reactor facility could safely store spent fuel on an interim basis. See, *e. g.,* 42 Fed. Reg. 34391 (1977) ("As part of the licensing process for an individual power reactor facility, the Commission does review the facility in question in order to assure that the design provides for safe methods for interim storage of spent nuclear fuel"). Indeed, we are told that, for safety reasons, spent fuel usually must be stored onsite for "at least five years." Tr. of Oral Arg. 105. It follows, then, that under the AEA, the operator of a licensed reactor would have been authorized (and in fact required) to keep spent fuel onsite after removing it from a reactor. See *id.,* at 97. It does not follow that the AEA permitted other parties, without a license, to take spent nuclear fuel offsite and do with it what they pleased.

### III

Without any persuasive argument on the merits, the NRC urges the Court to dismiss Texas's and Fasken's claims on jurisdictional grounds. Ultimately, the Court does just that and thus paves the way for the agency to issue its misbegotten license. As the Court sees it, Texas and Fasken cannot challenge the NRC's decision in court because they failed to jump through the right hoops before the agency.

The Court's reasoning follows this path: Texas and Fasken seek judicial review under the Hobbs Act. That statute permits "[a]ny party aggrieved by [an agency's] final order [to] file a petition to review the order in the court of appeals wherein venue lies." 28 U. S. C. § 2344. And, in the Court's estimation, neither Texas nor Fasken qualifies as a "party aggrieved" by the NRC's decision. *Ante,* at 674.

In reaching that conclusion, the Court does not (and cannot) question that Texas and Fasken have much at stake. ISP's plan to store radioactive waste in the Permian Basin threatens harm to their citizens and employees, poses risks to their lands, air, and waters, and will diminish the value of Fasken's property. See Part I–B, *supra.* Even the NRC has acknowledged that Fasken's interests might be affected by ISP's license, 90 N. R. C., at 51–52, and the agency does not dispute that the same holds true for Texas. Doubtless, Texas and Fasken are "aggrieved."

Still, the Court reasons, neither Texas nor Fasken are "parties" aggrieved by the NRC's decision to issue ISP's license. *Ante,* at 675. The agency may have solicited public comments in its environmental review. Texas and Fasken may have supplied comments. The agency may have accepted those comments and considered them before issuing its environmental review findings and final EIS that themselves form part of ISP's license. And, without question, Fasken struggled mightily to participate in the hearing the agency conducted under § 2239. But the NRC managed to keep the company out of that particular portion of its licens-

ing proceeding. And that, the Court concludes, is enough to prevent both Texas and Fasken from lodging any complaint in court about the agency's work.

## A

I see things differently. Lower courts have often assumed the phrase "party aggrieved" in the Hobbs Act requires those seeking relief from an agency's "final order" in court to have been "parties to any proceedings before the agency preliminary to issuance of" the challenged order. *Simmons* v. *ICC*, 716 F. 2d 40, 42 (CADC 1983) (citing §2344). The Court proceeds on that same assumption today. *Ante*, at 676. For present purposes, let us take it as given.

Doing so raises a few questions. First, what was the "final order" in this action? Plainly, the NRC's licensing decision. Second, what were the "proceedings before the agency preliminary to issuance of [that] order?" *Simmons*, 716 F. 2d, at 42. As we have seen, the NRC's licensing proceeding comprised several parts—including the safety review, environmental review, and a §2239 hearing. Third, who qualified as a party in that proceeding? To answer that question, the Court relies on a line of D. C. Circuit cases that recognize "[t]he degree of participation necessary to achieve party status varies according to the formality with which the proceeding was conducted." *Water Transp. Assn.* v. *ICC*, 819 F. 2d 1189, 1192, and n. 28 (CADC 1987) (citing *Simmons* for this proposition); see also *ante*, at 676 (relying on *Simmons*).

To my mind, that answer resolves this case. Focus on the agency's environmental review. Remember, that review was an essential component of its licensing proceeding. See Part I–B, *supra*. The NRC itself admits that it could not sign off on ISP's license without completing an environmental impact statement weighing alternatives to ISP's proposal, including the possibility of denying it. *Ibid.* Reflecting as much, the agency's final license "package" included a preamble in which the agency recorded various

findings, including a finding that it had completed a final EIS. *Ibid.* The package also included a "concise public record of decision" outlining the findings of the agency's final EIS, incorporating that document by reference, and reporting its conclusion that ISP's license application should be granted. *Supra,* at 697 (citing 10 CFR § 51.102(a); App. 288–298).

Texas and Fasken were parties to that component of the agency's licensing proceeding. After preparing a draft EIS, the agency solicited comments from the public. Part I–B, *supra.* Both Texas and Fasken offered extensive comments, raising warnings about the impact of ISP's intended project on land, water, oil and gas reserves—and people. *Ibid.* The agency accepted those comments and undertook to address them in its final EIS. *Ibid.*

That is enough to make Texas and Fasken "parties" to "any proceedings before the agency preliminary to issuance of" the challenged order. *Simmons,* 716 F. 2d, at 42. In "administrative proceedings" contemplating "notice-and-comment," lower courts have long said that "commenting" qualifies an individual as a "party" for purposes of the Hobbs Act. *ACA Int'l* v. *FCC,* 885 F. 3d 687, 711 (CADC 2018). That much is surely right. And it means that Texas and Fasken are "parties" who may be heard in court under the Hobbs Act.

## B

For its part, the Court seems to consider Texas's and Fasken's participation in the agency's environmental review irrelevant. As I understand it, the Court thinks that, to "qualify as a party," Texas and Fasken also had to "successfully intervene" in the agency's § 2239 hearing. *Ante,* at 669.

I fail to see why. By the terms of one statute and set of regulations, the agency may have had to offer a public hearing. But by the terms of other statutes and regulations, the agency also had to conduct, among other things, an environmental review and a safety review. Each of these steps,

GORSUCH, J., dissenting

the agency insists, was necessary before it could reach a decision on ISP's license application. See Part I–B, *supra*; see also, *e. g.*, 81 Fed. Reg. 79532. And all of the agency's various tracks of review culminated in a single decision. Indeed, the agency incorporated the conclusions of each into its final license "package." Part I–B, *supra*. And without doubt, Texas and Fasken participated as parties in the environmental-review portion of the agency's licensing proceeding. *Ibid.* The Hobbs Act requires no more. See *Simmons*, 716 F. 2d, at 42 (participation as a "party" in "*any* proceedings before the agency preliminary to issuance of" the challenged order is sufficient (emphasis added)).

That conclusion is confirmed by the terms of §2239 itself. The statute provides that, "[i]n any proceeding . . . for the granting . . . of any license," the NRC "shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding." §2239(a)(1)(A). With this language, Congress clearly sought to ensure that anyone affected by the agency's decision would have at least one forum in which to express their views to the NRC. But nowhere did Congress say §2239 is the *only* way someone can participate in the agency's licensing proceeding. Nowhere, for example, did it say that someone *must* request a hearing under §2239 to become a party to the NRC's licensing proceeding.

More than that, the statute's terms preclude any interpretation conflating a hearing before the agency with the licensing proceeding itself. The statute provides that the "hearing" occurs "*[i]n* any proceeding . . . for the granting . . . of any license"—that is to say, *in* an overall licensing proceeding. The statute does not say that the hearing *is* the licensing proceeding. Surely, too, that is as it must be. Under §2239, after all, a hearing may or may not be required, depending on whether someone "request[s]" one. And, with or without a hearing, the NRC must, by statute and regulation,

undertake an extensive "proceeding . . . for the granting . . . of [the] license" that includes an environmental review and a safety review. § 2239(a)(1)(A); see also Part I–B, *supra*.[3]

Any possible lingering doubt on this score is resolved by recalling that the Hobbs Act is a jurisdictional statute. Jurisdictional statutes, this Court has said, must be read in light of a "strong presumption that Congress intends judicial review of administrative action." *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 670 (1986). It is a presumption that can be overcome "only upon a showing of clear and convincing evidence of a contrary legislative intent." *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 141 (1967) (internal quotation marks omitted). And here that presumption counsels strongly against assuming that those who participate in one aspect of an NRC licensing proceeding must participate in another just to be heard in court. Certainly, nothing in the Hobbs Act or § 2239 clearly and convincingly requires that result.

---

[3] The Court insists that litigants cannot "use collateral environmental claims to evade the limits on judicial review imposed by an exclusive judicial-review provision like the Hobbs Act." *Ante*, at 688–689, n. 4. But that truism is no answer. Texas and Fasken are not seeking to evade the Hobbs Act by bringing, say, an Administrative Procedure Act claim based on their environmental objections (much as the litigants in the two circuit cases the Court cites sought to do in order to evade other exclusive judicial-review provisions). See *ibid.* Instead, Texas and Fasken claim they are entitled to proceed under the Hobbs Act itself. And while commenting on an EIS may not always be enough to guarantee "party" status under the Hobbs Act, it suffices here given the way the NRC's licensing proceeding is structured. Nor is it any answer to insist, as the Court does, that the § 2239 hearing is a formal "agency adjudication" where "intervention" is required. *Ante*, at 677, 688, and n. 4. For one thing, nothing in § 2239(a)(1)(A) suggests that the label "formal agency adjudication" is appropriate. For another, if the agency's licensing proceeding involves an adjudication at all, it "is a very strange type of adjudication," because it only sometimes includes a hearing, yet always requires the agency to open "a notice-and-comment process." Tr. of Oral Arg. 87.

GORSUCH, J., dissenting

A corollary to the presumption favoring judicial review only serves to bolster that conclusion. "[A]bsent clear statement," this Court does not read legislation "to place in executive hands authority to remove cases from the Judiciary's domain." *Kucana* v. *Holder*, 558 U. S. 233, 237 (2010). The reason for that rule is obvious. Allowing agencies to decide who can challenge their work in court is like letting the fox guard the henhouse: Given the opportunity, agencies are likely to ensure nothing survives.

This case illustrates the risk. Section 2239 promises that the NRC "shall grant a hearing upon the request" of anyone who "may be affected" by a proposed license and "shall admit any such person as a party to such proceeding." By any measure, Fasken satisfied the law's terms. It sought to participate, and the agency concluded that it qualified as a "person whose interest may be affected." See 90 N. R. C., at 47, 52. From that, it followed that the NRC had to "admit" Fasken as "a party."

Despite that mandate, the agency (again) charted its own course. It developed restrictive internal rules regulating who may "intervene" in its hearing and what "contentions" it considers "admissible." See *supra*, at 696 (citing 10 CFR § 2.309(f)). Then, it deployed those rules to exclude Fasken and others who sought to participate, turning what was supposed to be a public hearing more nearly into an echo chamber involving agency staff and ISP. 90 N. R. C., at 57–64. To top it all off, the agency now asks us to believe that § 2239 (supplemented, of course, by its own regulations) supplies the only way someone can become a "party" to its licensing proceeding. Brief for Federal Petitioners 19–20.

By that series of steps, the agency effectively seeks to control who may challenge its decisions in court—and ensure that the answer is no one. Perhaps, as the Court observes, Fasken could have challenged the agency's internal regulations restricting who may participate in a § 2239 hearing, ar-

guing that they defy the statute's plain terms. See *ante*, at 680. And perhaps someone should consider doing just that.[4] But the hard fact remains that, by accepting the NRC's strained view that §2239 represents the only way for someone to become a party to its licensing proceedings, we effectively allow the agency to keep even a neighboring landowner and the very State in which massive amounts of spent nuclear fuel will be stored from being heard in court. Fox meet henhouse.

*

The NWPA prohibits the NRC from licensing the storage of spent nuclear fuel at privately owned sites like ISP's. Despite that command, the NRC forged ahead anyway. As the Fifth Circuit recognized, the agency's decision was unlawful. Nor does anything in the Hobbs Act prevent us from admitting what we know to be true. Both Texas and Fasken are "parties aggrieved" by the agency's decision. The NRC's theory otherwise requires us to ignore the full scope of the agency's own licensing proceeding. It forces us to reimagine a statute expanding public access to the agency's administrative proceedings into one restricting access. And it asks us to believe that the very State in which the agency

---

[4] After first touting the availability of this course, the Court later, in dicta, seems to disparage its prospects, citing a 35-year-old D. C. Circuit decision for the proposition that the NRC's regulations do not "set too high a bar" for intervention. See *ante*, at 689 (citing *Union of Concerned Scientists* v. *NRC*, 920 F. 2d 50 (1990)). But, of course, that decision hardly binds this Court. Notably, too, the D. C. Circuit did not pass on the agency's intervention regulations alone, but only those regulations "in conjunction with the [NRC's] longstanding late-filing rule." *Id.*, at 53 ("UCS does not . . . contend that the heightened pleading requirement, standing alone, would be illegal"). In doing so, as well, the court invoked *Chevron* deference, an approach this Court has since rejected. See 920 F. 2d, at 54 (citing *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), overruled by *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369 (2024)).

GORSUCH, J., dissenting

intends to store spent nuclear fuel indefinitely cannot be heard in court to complain about the agency's plans. Because nothing in the law requires us to indulge any of those fantasies, I respectfully dissent.

Page Proof Pending Publication

## Reporter's Note

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 697, line 15 from bottom: "accord" is changed to "accordance"
p. 699, line 19: "the" is deleted